Thomas W. PUTNEY and Mary
Putney, Plaintiffs,

v.

Henry W. ROSIN, et al., Defendants.

C.A. No. 98C–10–181 JTV.

Superior Court of Delaware,
New Castle County.

Submitted: July 9, 2001.
Decided: Oct. 30, 2001.

Ben T. Castle, Wilmington, Delaware, for Plaintiffs.

James P. Hall, Wilmington, Delaware, for Defendants.

## OPINION

VAUGHN, Resident Judge.

The plaintiffs have filed a motion for a new trial after a jury returned a verdict in their favor, but only in the amount of $1200. Plaintiff Thomas W. Putney's [1] claim was one for personal injuries caused by an alleged assault committed upon him by the defendant. His wife, Mary Putney, asserted a claim for loss of consortium. The defendant, Henry W. Rosin, denied that he had assaulted Mr. Putney and disputed the nature and extent of the injuries claimed by Mr. Putney. As grounds for a new trial, the plaintiffs contend that the verdict is against the weight of the evidence and that defense counsel made improper, prejudicial comments in his opening statement and closing argument. After having given this matter careful consideration, I am convinced that defense counsel did make comments in his opening statement and closing argument which were so highly improper and prejudicial that the plaintiffs were denied a fair trial. I reach this conclusion even though at trial the jury was specifically instructed to disregard the objectionable remarks. Therefore, the plaintiffs' motion for a new trial will be granted.[2]

## THE FACTS

Mr. Putney and Mr. Rosin owned adjoining business premises on Tatnall Street in Wilmington. On January 8, 1997, Mr. Putney went into Mr. Rosin's place of business to air a complaint over the alleged conduct of tenants in Mr. Rosin's building. Mr. Putney testified that Mr. Rosin became enraged and assaulted him. He testified that Mr. Rosin finished the assault by pushing him out the door, causing him to fall against a parked car and then onto the sidewalk. Mr. Rosin testified that he merely tried to escort Mr. Putney out the door when he wouldn't leave, and that Mr. Putney planted his feet and then kept a foot in the door so that Mr. Rosin couldn't close it. He denied that Mr. Putney fell to the sidewalk. Later that day Mr. Putney went to the emergency ward of a local hospital. The emergency department record shows a diagnosis of contusions to the back and foot. After a short time there, he was discharged and sent home.

Mr. Putney had a pre-existing heart condition known as atrial fibrillation, which is an irregular heartbeat. Prior to January 8, 1997, the condition had been asymptomatic for about three years. On January 21, 1997, he went to see his family doctor, Dr. Young, because, according to his testimony, he wasn't feeling well from the assault. Dr. Young's notes state "c/c assaulted 01/08/97" and "assaulted by another man in an office." The records also document that Dr. Young determined, or at least suspected, that Mr. Putney had suffered a new onset of atrial fibrillation. He referred the plaintiff to the doctor who had previously treated his heart condition, Dr.

---

1. Hereafter, where plaintiff is used in the singular, it refers to Mr. Putney.

2. Since a new trial is being ordered because of defense counsel's comments in his opening and closing, it is not necessary to address plaintiffs' contention that the verdict is against the weight of the evidence.

Pennock. On January 23 Dr. Pennock conducted a cardiogram which verified that Mr. Putney was experiencing atrial fibrillation. Dr. Pennock's medical record for that day states that Mr. Putney "was assaulted and he developed a racing heartbeat afterwards where he was seen in the St. Francis Emergency Room." Dr. Pennock was aware that the diagnosis of new atrial fibrillation was being made subsequent to that event. Dr. Pennock, and other doctors, treated Mr. Putney for the condition through approximately July 1997 and continued to see him for follow up through May 2001. Dr. Pennock's records include an entry made on March 3, 2000 documenting a telephone conversation he had with Mr. Putney's lawyer on February 2, 2000. The record indicates that the attorney asked him whether, to a reasonable medical probability, the atrial fibrillation could have been precipitated by stress, and that Dr. Pennock said yes.[3]

At trial Mr. Putney contended that his new onset of atrial fibrillation was caused by the alleged assault. His claim was supported by the testimony of his treating physician. The defense case included testimony from another doctor who testified that the post-January 8 atrial fibrillation was caused by other factors unrelated to the encounter between Mr. Putney and Mr. Rosin. He testified that the emergency ward record from Mr. Putney's visit contained no mention of symptoms such as shortness or breath or irregular heartbeat which he would expect to see if the encounter had caused a new atrial fibrillation. The jury obviously rejected the contention that Mr. Putney's heart condition was aggravated by the incident and award-ed a verdict more commensurate with a bruised foot and/or back which were documented in the emergency room record.[4]

In his opening statement, defense counsel stated to the jury that the claim that the alleged assault had caused a renewal of Mr. Putney's atrial fibrillation was "manufactured" by Mr. Putney's lawyer. Specifically he commented as follows:

> What happens here is the plaintiff goes to the emergency room and makes complaint of a foot bruise or back bruise. And then he consults with a lawyer and, together, Mr. Putney and his lawyer, are manufacturing a claim. We don't want to sue simply on a bruised foot, so now they add a claim for aggravation of his heart condition which this man has suffered since 1986. This claim is a manufactured claim by his lawyer.

At that point, plaintiff's counsel objected, the objection was sustained, and the jury was instructed to disregard the remarks.

In his closing argument, defense counsel argued that the plaintiff was motivated by greed:

> He [plaintiff's counsel] asked for motives. What motive would a 63–year–old grandfather have? I don't know. What are some possible motives? Greed. This case is about money. He wants you to award him money because he claims my client did not act properly. He claims that my client assaulted him.

After emphasizing to the jury that Mr. Putney did not complain of any chest pain, shortness of breath, irregular heartbeat, or other symptom that might be evidence of a heart problem when he went to the emer-

---

**3.** The entire entry reads as follows: "Consultation with … lawyer for Mr. Putney, was performed by phone for about six minutes duration on 02/02/00. A discussion was held concerning the patient's atrial fibrillation and whether though (sic) medical reasonable probability he could have had an episode of atrial fibrillation precipitated by stress. The answer is yes, and information was related to [the attorney]."

**4.** In fact, when the forelady announced the verdict, she blurted out "the cost of the emergency room."

gency room, defense counsel continued his theme that the plaintiff and his attorney had manufactured the connection between the alleged assault and the plaintiff's atrial fibrillation. He argued as follows:

> That's the end of this story. That's the end of this case until Mr. Putney hires a lawyer ... Let's think about this. Dr. Pennock wants to offer an opinion that this incident caused the aggravation of the atrial fibrillation and he doesn't even look at the emergency room records on the day of the incident. What he did do before that is talk to [plaintiff's counsel].

No objection was made, but at the conclusion of defense counsel's closing the Court *sua sponte* instructed the jury that these comments by defense counsel were improper and should be disregarded.

## STANDARD OF REVIEW

▮▮▮ The Supreme Court has held that "[a]ny effort to mislead the jury or appeal to its bias or prejudice is inappropriate."[5] In order to determine whether a new trial is called for in connection with improper comments, the trial court must determine whether the improper comments prejudicially affected substantial rights of the plaintiffs.[6] In doing so, the court should consider: (1) the closeness of the case, (2) the centrality of the issue affected by the improper comments, and (3) the steps taken in mitigation.[7]

## DISCUSSION

▮▮▮ Defense counsel stated to the jury that the plaintiff's attorney had "manufactured" the plaintiff's claim. His comments are nothing less than a direct accusation that the plaintiff's attorney, the plaintiff, and, by implication, Dr. Pennock, fabricated the causal connection between the January 8, 1997 incident and the new onset of atrial fibrillation, and then committed a fraud upon the Court and the jury by presenting that allegation at trial.

In his response to the plaintiffs' motion for a new trial, defense counsel makes no attempt to back away from his comments. He contends that his comments were entirely proper and supported by the evidence. He contends that his assertion that "Mr. Putney and his lawyer manufactured a claim after the fact"[8] is supported by (1) evidence that Mr. Putney "never complained of any chest pain, discomfort, shortness of breath, racing heartbeat, rapid heartbeat or any chest-related problems whatsoever at the emergency room on January 8, 1997, two hours after this alleged 'assault' ";[9] (2) evidence that the treating physician's records contain no note or remark linking the atrial fibrillation with the January 8 assault prior to the phone call plaintiff's counsel made to the doctor in February 2000; and (3) evidence that Dr. Pennock did not express an opinion that the alleged assault caused the new atrial fibrillation until after his conversation with plaintiff's counsel. He also reiterates his contention that greed was a possible motive for Mr. Putney to make up the alleged assault.

Defense counsel's contentions must be rejected. They have no merit. His "manufactured" claim argument is not supported by the record at all. Less than three weeks after the January 8 incident, the plaintiff's doctors diagnosed a new onset of atrial fibrillation. The condition had been asymptomatic for three years. The mere fact that a direct causal link between

---

**5.** *DeAngelis v. Harrison,* Del.Supr., 628 A.2d 77, 80 (1993).

**6.** *Hughes v. State,* Del.Supr., 437 A.2d 559, 571 (1981).

**7.** *Id.* at 571.

**8.** Defendant's response to plaintiff's motion for a new trial.

**9.** *Id.*

an event and an injury may not be expressly documented in medical records in so many words, or that there may be some delay between an event and a symptom, creates no inference that a claim is made in bad faith. Such circumstances are a normal subject of litigation. In addition, there is nothing unusual about a plaintiff's lawyer discussing the plaintiff's claim with a treating physician. Plaintiff's counsel must be able to do so in order to evaluate and prepare the plaintiff's case, and must be able to do so without fear of being subjected to unwarranted accusations of witness tampering. Nothing in this record even remotely supports defense counsel's argument.

Like most comments that are not supported by the evidence, the ones made here tended to suggest to the jurors that defense counsel was privy to some relevant information which was not included in the evidence being presented to them. Defense counsel's comments, however, go far beyond that. They were highly inflammatory and were clearly meant to mislead the jury and unfairly prejudice the jury against the plaintiff and his attorney. The charge that a plaintiff's claim is "manufactured" is calculated to prejudice the plaintiff's attorney, and by association, the plaintiff himself, by playing on well known negative aspects of the public's perception of the legal profession. In addition, an unjustified attack on the integrity of opposing counsel at trial is a violation of the Rules of Professional Conduct.[10] Defense counsel's comments concerning opposing counsel were highly improper.[11]

■ A new trial should be granted if improper comments prejudicially affect substantial rights of the plaintiff. Fortunately, improper comments in the form of personal attacks on opposing counsel's integrity are not something that this Court is required to evaluate often.[12] Here, the case was clearly a close one. The jury had to decide whether to accept the testimony of Mr. Putney and his treating physician or whether to accept the testimony of the physician called by the defense. A different jury may well have decided the case differently. The improper comments affected a central issue. The only issues in the case were what exactly happened between Mr. Putney and Mr. Rosin on January 8 and did it cause the new onset of atrial fibrillation. The physician called by the defense did not dispute the new diagnosis of atrial fibrillation. He disputed whether the January 8 incident caused the new onset. As to steps taken in mitigation, I find that the prejudice to the plaintiff was incurable. The comments were contained in both the opening and the closing and were forcefully presented. An accusation in the presence of the jury that the plaintiff's attorney has manufactured the plaintiff's claim so taints the fairness of the proceeding that no instruction can dispel the prejudice. I conclude, therefore, that the improper comments of counsel did prejudicially affect the plaintiffs' right to a fair trial.

■ The plaintiffs have urged the Court to grant a new trial on damages only. The jury allocated fault between the parties 60–40 in favor of the plaintiff. A partial retrial is permitted where the issue to be retried is clearly severable from other issues, and no injustice will result.[13]

---

10. Rule 3.4: "A lawyer shall not: ... (e) in trial, allude to any matter ... that will not be supported by admissible evidence."

11. Defense counsel's charge that the plaintiff was motivated by greed was also improper.

12. Cases from other jurisdictions which have considered the effect of improper comments of this nature are collected at 96 A.L.R.2d 9.

13. *Chrysler Corporation v. Quimby*, Del.Supr., 144 A.2d 123 (1958).

In this case, the jury cannot make a sound decision on the issue of causation and damages without evaluating the evidence concerning what occurred during the January 8 incident. Presenting the jury with a predetermination of liability may lead to an unsound, and therefore unjust, jury result. A new trial will be on all issues.

Therefore, the plaintiffs' motion for a new trial is *granted.*

**IT IS SO ORDERED.**