# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

ENVOLVE PHARMACY SOLUTIONS, )
INC., ET AL., )
                Plaintiffs, )
)
       v. )    **C.A. No. N19C-12-214**
)           **PRW CCLD**
)
RITE AID HDQTRS. CORP., )
and RITE AID CORP., )
            Defendants. )

Submitted: July 13, 2023
Decided: August 30, 2023

## MEMORANDUM OPINION AND ORDER

*Upon Plaintiffs Envolve Pharmacy Solutions, Inc., et al.'s Motion for Judgment Notwithstanding the Verdict or, Alternatively, a New Trial,*
**DENIED,**

*Upon Defendants Rite Aid Hdqtrs. Corp. and Rite Aid Corp.'s Motion for Costs,*
**GRANTED.**

Karen Jacobs, Esquire, Alexandra M. Cumings, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Keith J. Harrison, Esquire, Christopher Flynn, Esquire, Daniel W. Wolff, Esquire, Jerome P. DeSanto, Esquire, Jed Wulfekotte, Esquire, CROWELL & MORING LLP, Washington, D.C., *Attorneys for Plaintiffs Envolve Pharmacy Solutions, Inc., et al.*

Corinne Elise Amato, Esquire, Eric J. Juray, Esquire, Jason W. Rigby, Esquire, PRICKETT, JONES & ELLIOT, P.A., Wilmington, Delaware; Neil K. Gilman, Esquire, Christopher J. Dufek, Esquire, Brianne Reese, Esquire, HUNTON ANDREWS KURTH LLP, Washington, D.C.; John B. Shely, Esquire, Courtney B. Glaser, Esquire, Kelsey J. Hope, Esquire, HUNTON ANDREWS KURTH LLP, Houston, Texas, *Attorneys for Defendants Rite Aid Hdqtrs. Corp. and Rite Aid Corp.*

**WALLACE, J.**

Plaintiffs filed this action in December 2019. In May 2023, the parties undertook a two-week jury trial. Plaintiffs' case involved two breach-of-contract claims, one unjust enrichment claim, and two claimed exceptions to the statute of limitations. Defendants' case involved a voluntary payment defense. The jury returned a clean sweep verdict for Defendants. Now, Plaintiffs request judgment notwithstanding the verdict on all claims and defenses. Plaintiffs alternatively ask for a new trial. Defendants seek costs. For the reasons set forth below: Plaintiffs' motion for judgment notwithstanding the verdict is **DENIED** in full; Plaintiffs' alternative motion for a new trial is **DENIED**; and Defendants' motion for costs is **GRANTED**.

## I. BACKGROUND

Plaintiffs Centene[1] filed this action against Defendants Rite Aid[2] in December 2019.[3] Originally, Centene asserted six claims: (1) fraud/intentional misrepresentation; (2) breach of the 2003 Contract between Plaintiff Envolve Pharmacy Solutions, Inc. ("Envolve") and Rite Aid; (3) breach of the 2003 Contract

---

[1] "Centene" refers to the Plaintiffs in this action. Plaintiffs are a collective of health plans and pharmacy benefit managers. For a more detailed explanation of the parties in this action, as well as the factual background leading up to trial, see the Court's decision from a few months ago. *Envolve Pharm. Sols., Inc. v. Rite Aid Headquarters Corp.*, 2023 WL 2547994 (Del. Super. Ct. Mar. 17, 2023).

[2] "Rite Aid" refers to the Defendants in this action. Those Defendants are Rite Aid Hdqtrs. Corp. and Rite Aid Corp. *See Envolve Pharm. Sols., Inc.*, 2023 WL 2547994, at *2.

[3] *See* Complaint ("Compl.") (D.I. 1).

as a third-party beneficiary; (4) breach of the 2013 Contract between Envolve and Rite Aid; (5) breach of the 2013 Contract as a third-party beneficiary; and (6) unjust enrichment related to the 1996 Caremark Contract between Caremark L.L.C. f/k/a PCS Health Systems ("Caremark") and Rite Aid.[4]

On Rite Aid's earlier motion, the Court dismissed the fraud claim and both third-party beneficiary breach-of-contract claims.[5] The Court also dismissed the unjust enrichment claim with respect to Envolve, but that claim remained viable with respect to the other Plaintiffs.[6]

Thereafter, Centene filed its Amended Complaint and asserted three causes of action: (1) breach of the 2003 Contract between Envolve and Rite Aid, (2) breach of the 2013 Contract between Envolve and Rite Aid, and (3) unjust enrichment related to the 1996 Caremark Contract for all Plaintiffs except Envolve.[7] Discovery ensued.

After discovery, Centene moved for partial summary judgment on its breach of the 2003 Contract claim and breach of the 2013 Contract claim.[8] Centene also argued Rite Aid was collaterally estopped from relitigating the meaning of certain

---

[4]   *Id.* ¶¶ 70-137.

[5]   *See Envolve Pharm. Sols., Inc. v. Rite Aid Hdqtrs. Corp.*, 2021 WL 140919, at *11 (Del. Super. Ct. Jan. 15, 2021), *reh'g denied*, 2021 WL 855866 (Del. Super. Ct. Mar. 8, 2021).

[6]   *Envolve Pharm. Sols., Inc.*, 2021 WL 140919, at *11.

[7]   Amended Complaint ("Am. Compl.") ¶¶ 82-149 (D.I. 107).

[8]   *See* Centene's Motion for Partial Summary Judgment at 31-39 (D.I. 228, D.I. 229).

contractual language.[9] Simultaneously, Rite Aid moved for summary judgment on the three remaining claims.[10] Rite Aid also argued Delaware's three-year statute of limitations barred the claims with no applicable exception and the voluntary payment doctrine defeated Centene's claims.[11]

Ultimately, both motions were denied. But, in its written decision, the Court made certain determinations relating to the relevant contracts' language.[12] The Court will briefly highlight the relevant facts known at the time of summary judgment and the determinations that framed the issues for trial.

In 2008, Rite Aid launched its Rx Savings Card Program (the "Program").[13] The Program offered discounts on certain generic and brand name drugs.[14] The Program had no enrollment fee.[15] To enroll, a person completed a form containing demographic information, signed a HIPAA waiver, and signed a marketing authorization.[16] The Program permitted one to enroll his or her family members.[17]

Additionally, from 2008 to 2015, Rite Aid had a price-matching policy (the

---

[9] *See id.* at 29-31.

[10] *See* Rite Aid's Motion for Summary Judgment at 25-39 (D.I. 222, D.I. 223).

[11] *See id.* at 12-25, 39-41.

[12] *See Envolve Pharm. Sols., Inc.*, 2023 WL 2547994.

[13] *Id.* at *4.

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

"Price-Matching Policy").[18] The Price-Matching Policy permitted a Rite Aid pharmacist to match a competitor's verified price.[19] When visiting, a customer would provide a Rite Aid pharmacist with a competitor's verified price (subject to geographical limitations), and that pharmacist, at the his or her discretion, could then choose to match that lower price.[20]

Whether Program prices and Price-Matching Policy prices fit within certain contractual language was a chief issue in this action.

Three contracts were relevant for summary judgment and eventually trial:[21] the 2003 Contract, the 2013 Contract, and the Caremark Contract.[22] The contractual definitions of Usual and Customary ("U&C") price were front and center throughout this action. The 2003 Contract defines U&C price as: "Those amounts which [Rite Aid] normally charges its private pay patients for comparable Pharmaceutical Services and as may be provided to Patient-Beneficiaries of a Third Party Payor, as provided herein."[23] The 2013 Contract defines U&C price as "the lowest price [Rite Aid] would charge to a non-contracted, cash-paying customer with no insurance for

---

[18] *Id.* at *5.

[19] *Id.*

[20] *See id.*

[21] Centene had a fourth claim based on the "Argus Contract," which Centene withdrew before trial.

[22] For a detailed overview of these contracts, see *Envolve Pharm. Sols., Inc.*, 2023 WL 2547994, at *2-5.

[23] *Id.* at *2 (alterations in original).

an identical Pharmacist Service on the date and at the location that the product is dispensed, inclusive of all applicable discounts, promotions, or other offers to attract customers."[24] The Caremark Contract defines U&C price as "the lowest price [Rite Aid] would charge to a particular customer if such customer were paying cash for an identical prescription on that particular day. This price must include any applicable discounts offered to attract customers."[25]

On summary judgment, the Court determined the Program was a contract. Thus, the Program was excluded from the 2013 Contract's U&C definition due to that definition's "non-contracted" language.[26] The Court further determined the Price-Matching Policy was not a contract.[27] The Court observed the Price-Matching Policy, in general terms, could be considered a discount.[28]

The Court denied both motions on the breach of the 2003 Contract claim.[29] The Court denied both motions on the breach of the 2013 Contract claim but held Program prices were excluded from the 2013 Contract's language, leaving only the Price-Matching Policy prices for that claim.[30] The Court denied Rite Aid's motion

---

[24]   *Id.* at *3 (alterations in original).

[25]   *Id.* at *5 (alterations in original).

[26]   *See id.* at *14-16.

[27]   *Id.*

[28]   *Id.*

[29]   *Id.* at *13.

[30]   *Id.* at *14-16.

on the Caremark Contract claim.[31] One pivotal issue left for trial was whether Program customers and Price-Matching Policy customers fell within the U&C definitions' "cash-paying customers" and "customer[s] . . . paying cash" language.[32]

In May 2023, the parties and the Court undertook a two-week jury trial. Centene presented its three remaining claims—two for breach of contract and one for unjust enrichment. Rite Aid moved for judgment as a matter of law at the conclusion of Centene's case in chief.[33] Rite Aid argued (a) Centene failed to prove Rite Aid acted without justification on the unjust enrichment claim, and (b) Centene failed to prove tolling applied to the statute of limitations.[34] The Court denied that motion.[35] On the justification issue, the Court noted "[t]he fact that perhaps Caremark and its pharmacies, including Rite Aid, . . . acted differently [than the Caremark Contract might suggest they should] and whether or not that would provide justification is a question of fact for this jury to determine."[36] On the tolling issue, the Court found that whether Centene was on inquiry notice and, if so, whether a diligent inquiry would've uncovered facts sufficient to assert the breach claims

---

[31] *Id.* at *17-18.

[32] *Id.* at *16-18.

[33] *See* Rite Aid's Motion for JMOL (D.I. 349); May 17, 2023 Trial Transcript ("May 17 Trial Tr.") at 4-25 (D.I. 369).

[34] Rite Aid's Motion for JMOL at 2-6.

[35] May 17 Trial Tr. at 25-29.

[36] *Id.* at 27.

were both disputed questions of fact for the jury to decide.[37]

During trial, Rite Aid presented two main defenses—statute of limitations (with no tolling exception thereto) and voluntary payment. At the close of all the evidence, Rite Aid renewed its motion for judgment as a matter of law. Centene countered with its own request for judgment as a matter of law on all claims.[38] Rite Aid renewed its previous motion and added arguments relating to price-matching and damages.[39] The Court denied both motions, noting "[s]o much of this [case] relies on the credibility of the witnesses," and "the Court simply cannot say as to any of the claims or defenses that a reasonable jury must find as a matter of law that there is no legally sufficient evidentiary basis to make counter findings."[40] The following trial day, the parties presented closing arguments and the jury deliberated.

The jury's verdict favored Rite Aid. Namely, the jury found Rite Aid succeeded on both its defenses.[41] This finding, in effect, mooted the breach-of-contract claims.[42] The finding also narrowed the time period for the unjust enrichment claim,[43] which the jury found Centene did not prove by a preponderance

---

[37] *Id.* at 28-29.

[38] May 19, 2023 Prayer Conference ("May 19 Trial Tr.") at 3-20 (D.I. 357).

[39] *Id.* at 22-24.

[40] *Id.* at 32.

[41] Verdict Form at 33, 37 (D.I. 354).

[42] *See id.* at 34.

[43] *Id.* at 36.

of the evidence.[44]  In short, the verdict was a shutout for Rite Aid.

Now before the Court are the parties' post-trial motions.  Rite Aid filed a limited motion for costs ("Rite Aid's Motion").[45]  Centene filed a motion for judgment notwithstanding the verdict on all three of its claims and on Rite Aid's defenses ("Centene's Motion").[46]  The Centene Motion alternatively requests a new trial.

The above is not an exhaustive recitation of the facts and relevant history.  So, the Court will discuss additional facts and proceedings as they become relevant to the analysis below.

## II.  STANDARD OF REVIEW

### A. MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

At the close of all the evidence, if a party moves for judgment as a matter of law under Superior Court Civil Rule 50(a) and the Court does not grant the motion, that party may renew its motion post-trial by filing a motion for judgment notwithstanding the verdict ("JNOV") under Civil Rule 50(b).[47]  When the Court is

---

[44]  *Id.*

[45]  *See* Rite Aid's Motion for Costs ("Motion for Costs") (D.I. 361).

[46]  *See* Centene's Motion for Judgment Notwithstanding the Verdict Or, Alternatively, for a New Trial ("Centene Motion") (D.I. 362).

[47]  *See* Del. Super. Ct. Civ. R. 50(b) (2023); *Chamberlain v. Pyle*, 2023 WL 1771013, at *2 (Del. Super. Ct. Feb. 6, 2023).

presented with a JNOV motion, the "trial judge does not weigh the evidence."[48]

Civil Rule 50(b) requires the Court to view the evidence in the light most favorable

to the non-moving party and determine "whether the evidence and all reasonable

inferences that can be drawn therefrom could justify" the jury's verdict.[49]  To find

for the moving party, the Court must determine "there is no legally sufficient

evidentiary basis for a reasonable jury to [have found] for the non-movant."[50]

Accordingly, "if the jury verdict is supported by palpable evidence, it must be

upheld."[51]

## B. MOTION FOR A NEW TRIAL

Civil Rule 59 permits the Court to grant a new trial for "any of the reasons for

which new trials have . . . been granted in the Superior Court."[52]  The jury's verdict

---

[48]  *Deardoff Assocs., Inc. v. Paul*, 2000 WL 1211130, at *2 (Del. Super. Ct. Apr. 27, 2000) (citing *McCloskey v. McKelvey*, 174 A.2d 691, 693 (Del. Super. Ct. 1961) ("[W]hen the Judge considers a motion to direct a verdict [i.e., JNOV] he is not required to weigh the evidence.")).

[49]  *Chamberlain*, 2023 WL 1771013, at *2 (quoting *Mumford v. Paris*, 2003 WL 231611, at *2 (Del. Super. Ct. Jan. 31, 2003)); *see also Deardoff Assocs., Inc.*, 2000 WL 1211130, at *2 ("Superior Court Civil Rule 50(b) requires that the Court consider the evidence in a light most favorable to the non-moving party." (citing *Parks v. Ziegler*, 221 A.2d 510, 511 (Del. 1996))).

[50]  *Mumford*, 2003 WL 231611, at *2 (cleaned up) (quoting *Brown v. Liberty Mutual Ins. Co.*, 774 A.2d 232, 245 (Del. 2001)); *Deardoff Assocs., Inc.*, 2000 WL 1211130, at *2 (citing *Eustice v. Rupert*, 460 A.2d 507, 508-09 (Del. 1983)).

[51]  *Deardoff Assocs., Inc.*, 2000 WL 1211130, at *2 (citing *Gannett Co., Inc. v. Re*, 496 A.2d 553, 557 (Del. 1985)); *Mumford*, 2003 WL 231611, at *2 ("Thus, the factual findings of a jury will not be disturbed if there is *any* competent evidence upon which the verdict could reasonably be based." (emphasis in original) (quoting *Delaware Elec. Coop., Inc. v. Pitts*, 1993 WL 445474, at *1 (Del. Oct. 22, 1993))).

[52]  Del. Super. Ct. Civ. R. 59(a) (2023); *Deardoff Assocs., Inc.*, 2000 WL 1211130, at *4.

is presumed to be correct.[53] "When considering a motion for a new trial, the Superior Court must give enormous deference to the jury's verdict, and should not set aside the jury's verdict unless a reasonable jury could not have reached the result."[54] The Court should not set aside a jury's verdict unless: (1) "it contradicts the great weight of the evidence"; (2) the "jury disregarded the applicable rules of law"; or (3) "the jury's verdict is tainted by legal error committed by the trial court before or during the trial."[55] To grant a new trial based on evidentiary rulings, the moving party must demonstrate the rulings were incorrect, and "the mistakes constituted significant prejudice so as to have denied the [moving party] a fair trial."[56]

## C. MOTION FOR COSTS

Superior Court Civil Rule 54(d) provides that "costs shall be allowed as of course to the prevailing party upon application to the Court within ten (10) days of

---

[53] *Deardoff Assocs., Inc.*, 2000 WL 1211130, at *4 (citing *Lacey v. Beck*, 161 A.2d 579, 580 (Del. Super. Ct. 1960)); *Kelly v. McHaddon*, 2002 WL 388120, at *4 (Del. Super. Ct. Mar. 4, 2002) (citation omitted).

[54] *LCT Cap., LLC v. NGL Energy P'rs LP*, 249 A.3d 77, 90 (Del. 2021) (cleaned up) (citations omitted); *Storey v. Camper*, 401 A.2d 458, 465 (Del. 1979) ("[O]n weight of the evidence motions, we hold that a trial judge is only permitted to set aside a jury verdict when in his judgment it is at least against the great weight of the evidence. In other words, barring exceptional circumstances, a trial judge should not set aside a jury verdict on such ground unless, on a review of all the evidence, the evidence preponderates so heavily against the jury verdict that a reasonable jury could not have reached the result.").

[55] *Kelly*, 2002 WL 388120, at *4 (citing *Camper*, 401 A.2d at 465); *Storey v. Castner*, 314 A.2d 187, 193 (Del. 1973); *DuPhilly v. Delaware Elec. Coop., Inc.*, 662 A.2d 821, 833-34 (Del. 1995)).

[56] *O'Riley v. Rogers*, 69 A.3d 1007, 1010 (Del. 2013) (internal quotation marks and citation omitted).

entry of final judgment unless the Court otherwise directs."[57] Awarding costs is a matter of judicial discretion,[58] but, generally, the prevailing party is entitled to costs.[59]

### III. PARTIES' CONTENTIONS

Centene moves for JNOV on its three claims and Rite Aid's two defenses. On the unjust enrichment claim, Centene insists it proved all elements, and, specifically, Rite Aid had no justification for not reporting Program prices and Price-Matching Policy prices as U&C.[60] Regarding its breach-of-contract claims, Centene maintains it proved all elements.[61] Centene next contends the great weight of the evidence established the inherently unknowable doctrine and fraudulent concealment doctrine tolled the statute of limitations.[62] Centene finally contends Rite Aid did not prove its voluntary payment defense because Rite Aid did not introduce evidence that Centene knew of Rite Aid's U&C reporting practices.[63]

---

[57] Del. Super. Ct. Civ. R. 54(d) (2023).

[58] *Phelps v. West*, 2018 WL 1341704, at *1 (Del. Super. Ct. Mar. 15, 2018) (citing *Olson v. A-Del Constr. Co., Inc.*, 2014 WL 1325909, at *1 (Del. Super. Ct. Feb. 12, 2014)).

[59] *Id.* (citing *Bodley v. Jones*, 65 A.2d 484, 487 (Del. Ch. 1948)).

[60] *See* Centene Motion at 4-10.

[61] *See id.* at 11-12.

[62] *See id.* at 12-14.

[63] *See id.* at 14-15.

Alternatively, Centene moves for a new trial on all issues. Centene contends Rite Aid's counsel improperly insinuated this case was "manufactured" by Centene's trial counsel, which tainted the verdict.[64] Next, Centene contends the Court prevented Centene from fairly responding to Rite Aid's "misleading" testimony and arguments.[65]

Rite Aid moves for costs. Rite Aid specifically seeks: (1) "[c]ourt, filing and e-service fees"; (2) "[s]ervice of process" costs; and (3) "[t]rial technology fees."[66] Rite Aid asks for a total of $15,181.67.[67]

## IV.  DISCUSSION

### A. CENTENE IS NOT ENTITLED TO JNOV.

As Centene properly notes, a motion for JNOV under Rule 50(b) is subject to the same standard as a motion for a directed verdict made post-trial.[68] Centene also properly notes the Court denied both parties' motions for judgment as a matter of law (i.e., directed verdict) at the close of all the evidence.[69] In that ruling, the Court observed "[s]o much of this [case] relies on the credibility of the witnesses."[70] Since

---

[64]  *See id.* at 15-22.

[65]  *See id.* at 22-34.

[66]  *See* Motion for Costs at 3.

[67]  *See id.*

[68]  *Deardoff Assocs., Inc.*, 2000 WL 1211130, at *2; *see also* Centene Motion at 3.

[69]  Centene Motion at 20.

[70]  May 19 Trial Tr. at 32.

then, almost nothing has changed. The facts are the same. The standard is the same.[71] What differs now is that the jury has made the credibility and evidence-weighing determinations Centene asked of it. And, at this point, the Court must afford considerable weight to those calls. Accordingly, the Court's ruling remains the same—Centene's motion for JNOV is denied.

### 1. *No JNOV on the Statute of Limitations Exceptions*

Centene contends it should be granted JNOV that the inherently unknowable and fraudulent concealment doctrines apply to toll the statute of limitations.[72] Rite Aid says substantial evidence supports the jury's finding that Centene failed to prove either exception.[73]

Regarding the inherently unknowable doctrine, the "statute is tolled where the injury is 'inherently unknowable and the claimant is blamelessly ignorant of the wrongful act and the injury complained of.'"[74] If such a circumstance arises, the statute starts to run "upon the discovery of facts 'constituting the basis of the cause of action *or* the existence of facts sufficient to put a person of ordinary intelligence

---

[71] *See Deardoff Assocs., Inc.*, 2000 WL 1211130, at *2 ("Since a motion for judgment notwithstanding the verdict under Rule 50(b) is a renewal of a motion for directed verdict made post-trial, it is subject to the same standard applied to test the latter." (citation omitted)).

[72] Centene Motion at 12.

[73] Rite Aid's Answering Brief in Opposition to Centene's Motion for Judgment Notwithstanding the Verdict or, Alternatively, a New Trial ("Rite Aid Answer") at 14 (D.I. 374).

[74] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004) (quoting *Coleman v. Pricewaterhousecoopers, LLC*, 854 A.2d 838, 842 (Del. 2004)).

and prudence on inquiry which, if pursued, would lead to the discovery' of such facts."[75]

By way of example here, Don Nagy, former senior vice president of network management at a Centene entity, testified for Centene.[76] Mr. Nagy was responsible for contracting with pharmacies, which included "ensuring that the contractual language was appropriate."[77] Rite Aid's counsel cross-examined Mr. Nagy regarding a November 3, 2010 email exchange between Mr. Nagy and an HEB employee.[78] HEB is a regional grocery chain.[79] HEB had created a discount card program and Mr. Nagy inquired about it.[80] The HEB employee reported that "[n]one

[75] *Coleman*, 854 A.2d at 842 (emphasis in original) (quoting *Becker v. Hamada, Inc.*, 455 A.2d 353, 356 (Del. 1982)). Centene appears to suggest that Delaware courts have set a low standard for the inherently unknowable doctrine. *See* Centene Motion at 12. Centene cites *Serviz, Inc. v. ServiceMaster Co., LLC*, 2022 WL 1164859, at *5 (Del. Super. Ct. Apr. 19, 2022). *Serviz, Inc.* states that "[n]o doubt, our Supreme Court has set a 'low threshold for the use of the doctrine of inherently unknowable injury.'" *Serviz, Inc.*, 2022 WL 1164859, at *5 (quoting *Certainteed Corp. v. Celotex Corp.*, 2005 WL 217032, at *9 (Del. Ch. Jan. 24, 2005)). But both *Serviz, Inc.* and *Certainteed Corp.* dealt with this doctrine at the motion to dismiss stage—where the standard is reasonable conceivability of success on a claim or defense—not post-trial. *See, e.g., Saunders v. Lightwave Logistics, Inc.*, 2023 WL 4851630, at *5 (Del. Super. Ct. July 28, 2023) (explaining and applying the "low threshold on what a plaintiff must demonstrate to survive a motion to dismiss" when finding that plaintiff "ha[d] alleged facts sufficient to put the Defendants on notice of his claim" of a tolling exception and had "alleged enough facts that it is reasonably conceivable he might well gain tolling of the statute of limitations he faces"). Centene's argument is unavailing; at trial, it had to prove by a preponderance of the evidence that the exception applied.

[76] May 10, 2023 Trial Transcript ("May 10 Trial Tr.") at 113-14 (D.I. 348).

[77] *Id.* at 114.

[78] *Id.* at 143.

[79] *Id.* at 135.

[80] *Id.* at 143-44.

of the discounts slash pricing related to [HEB's discount card] program are in the HEB pricing database dispensing system as they do not represent [HEB's] U&C."[81]

Thus, there is a legally sufficient evidentiary basis for the jury to have found Centene had facts sufficient to put Centene on notice that pharmacies, like Rite Aid, were not reporting discount card program prices, like Program prices, as U&C as early as November 2010—nine years before this action was filed. Centene insists the evidence warrants a contrary result.[82] But inquiries into the statute of limitations and its exceptions are often fact-specific.[83] And, if anything, the statute of limitations exceptions boiled down to credibility determinations, which were the sole province of the jury.[84]

The same is true with respect to Centene's fraudulent concealment theory. Centene argued to the jury that Rite Aid sought to "reduce the visibility" of its Program so Rite Aid could report inflated U&C to Centene.[85] Centene, now, cites

---

[81] *Id.* at 145.

[82] *See* Centene Motion at 12-13.

[83] *See Van Lake v. Sorin CRM USA, Inc.*, 2013 WL 1087583, at *8 (Del. Super. Ct. Feb. 15, 2013) (stating that application of the "discovery rule" for statute of limitations is "necessarily fact-specific").

[84] *See Washington v. State*, 4 A.3d 375, 381 (Del. 2010) (Ridgely, J., dissenting) ("Conflicts in the evidence, the determination of the credibility of the witnesses and the weight to be given their testimony are within the peculiar province of the jury."); *Messina v. Sipple*, 1993 WL 478080, at *1 (Del. Nov. 15, 1993) ("Credibility determinations are uniquely within the province of the jury as the trier of fact and the Court is bound by a jury verdict where there is some evidence to support it." (citing *Camper*, 401 A.2d at 465)).

[85] *See* Centene Motion at 13-14.

not testimony but relies mainly on various joint exhibits—the weight of which was left to the jury to ascribe.[86] The jury could (and obviously did) reject Centene's theory of fraudulent concealment if it found that evidence unconvincing.[87] As with any other matter of evidence-weighing, "[i]t is not for the Court to decide [what] the jury should have chosen to credit or discredit."[88]

### 2. *No JNOV on the Unjust Enrichment Claim*

Centene says the Caremark Contract's language did not exclude Program prices and Price-Matching Policy prices from its U&C definition.[89] Centene further says Centene was impoverished, Rite Aid was enriched, and there was no basis for the jury to conclude Rite Aid had any justification for its actions.[90] Rite Aid counters the trial evidence supports the jury's finding that Rite Aid's actions were justified,[91] and the jury could have reasonably concluded Centene failed to prove an enrichment and an impoverishment.[92]

---

[86] *See id.* (citing JX017, JX019, JX072).

[87] *See, e.g.*, *Stimson v. A.O. Smith Corp.*, 2020 WL 7631659, at *3 (Del. Super. Ct. Dec. 22, 2020) ("This Court abides by the principle that a 'jury is entitled to evaluate the testimony and to accept the portion it finds to be believable and to reject the balance.'" (quoting *Lee v. A.C. & S. Co.*, 1987 WL 16746, at *1 (Del. Super. Ct. July 22, 1987))).

[88] *Id.* (citation omitted).

[89] Centene Motion at 5-6.

[90] *Id.* at 6-10.

[91] Rite Aid Answer at 4-7.

[92] *Id.* at 7-10.

"Unjust enrichment is the 'unjust retention of a benefit to the loss of another, or the retention of money . . . of another against the fundamental principles of justice or equity and good conscience.'"[93] "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, [and] (4) the absence of justification."[94]

There is a legally sufficient evidentiary basis for the jury to have found Centene did not prove its unjust enrichment claim. First, trial produced evidence that Rite Aid was justified in not reporting its Program prices as U&C under the Caremark Contract. Brian Correia, senior vice president of network services at Caremark,[95] testified as a third-party witness. Rite Aid's counsel asked Mr. Correia: "Does Caremark consider a person who was an enrolled member of the Rite Aid [Program] to be a customer paying cash under the [U&C] definition of the . . . Caremark [C]ontract?"[96] Mr. Correia responded "[n]o, [Caremark] did not."[97] Rite

---

[93]  *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *42 (Del. Ch. Apr. 14, 2017) (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988)).

[94]  *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (citation omitted). There is a fifth element—absence of remedy provided by law—that is jurisdictional. *See St. Search P'rs, L.P. v. Ricon Int'l, L.L.C.*, 2005 WL 1953094, at *3 (Del. Super. Ct. Aug. 1, 2005).

[95]  May 11, 2023 Trial Transcript ("May 11 Trial Tr.") at 7 (D.I. 351).

[96]  *Id.* at 22-23.

[97]  *Id.* at 23. Only the Program, not the Price-Matching Policy, is relevant for this analysis. The statute of limitations bars claims arising before December 23, 2016. *See* Compl. (having a filing date of December 23, 2019); *see also* DEL. CODE ANN. tit. 10, § 8106(a) (2016) (noting that contract claims are subject to a three-year statute of limitations period); *Ocimum Biosolutions (India) Ltd. v. AstraZeneca UK Ltd.*, 2019 WL 6726836, at *8 (Del. Super. Ct. Dec. 4, 2019) ("In Delaware, the statute of limitations for breach of contract or unjust enrichment is 3 years."). The

Aid's counsel next asked whether Caremark considered a Program member to be a "cash paying customer."[98] Mr. Correia responded Caremark did not.[99] Rite Aid's counsel asked Mr. Correia: "Did Caremark consider the [Program] to be an applicable discount under the [U&C] definition of the . . . Caremark [C]ontract?"[100] Mr. Correia responded "[n]o, [Caremark] did not."[101]

William Wolfe, a Rite Aid employee from 1998 until 2011 who worked as Rite Aid's senior vice president of managed care and government affairs,[102] testified for Rite Aid. Rite Aid's counsel asked Mr. Wolfe: "Except for the Federal Employee Program, did Rite Aid and Care[m]ark share the same understanding that . . . Program prices did not have to be submitted as usual and customary under the [Caremark] [C]ontract?"[103] Mr. Wolfe responded affirmatively to that question.[104] Trial produced evidence that Rite Aid was justified when it did not report its Program prices as U&C under the Caremark Contract.

---

Price-Matching Policy ended in 2015. May 18, 2023 Trial Transcript ("May 18 Trial Tr.") at 73 (D.I. 370).

[98] May 11 Trial Tr. at 23.

[99] *Id.*

[100] *Id.* at 23-24.

[101] *Id.* at 24.

[102] May 18 Trial Tr. at 8-9.

[103] *Id.* at 48. Mr. Wolfe explained that the Federal Employee Program ("FEP") was different than the Caremark Contract because the FEP demanded a change to the definition of U&C in the FEP contract, and such change was "very specific, and for the purposes only of FEP." *Id.* at 48-49.

[104] *Id.* at 48.

According to Centene, trial produced "a mountain of evidence and testimony" showing Program prices were included in the Caremark Contract's U&C definition.[105] Maybe so, but when the jury is presented with conflicting testimony, the "jury is entitled to evaluate the testimony and to accept the portion it finds to be believable and to reject the balance."[106] The jury did that here—the Court doesn't decide whom the jury should've believed or not.[107]

Lastly, there is a legally sufficient evidentiary basis for the jury to have found Centene did not prove an enrichment to Rite Aid. Michael Petron testified as Centene's damages expert. Rite Aid's counsel questioned Mr. Petron's damages calculations by asking: "[I]s the amount [Centene] paid to Caremark the same as the amount . . . that Rite Aid received?"[108] To which Mr. Petron responded "[n]ot necessarily."[109] Mr. Petron further responded he "agree[d] with the general premise that Caremark had a spread which means that the amounts paid to it by [Centene] were different than the amounts paid ultimately to Rite Aid."[110] This is relevant to proving enrichment because Mr. Petron evaluated only what Centene paid to

---

[105] Centene Motion at 7.

[106] *Stimson*, 2020 WL 7631659, at *3 (quoting *Lee*, 1987 WL 16746, at *1).

[107] *Id.* (citing *Beatty v. Smedley*, 2003 WL 23353491, at *3 (Del. Super. Ct. Mar. 12, 2003)).

[108] May 16, 2023 Trial Transcript ("May 16 Trial Tr.") at 123 (D.I. 366).

[109] *Id.*

[110] *Id.* at 123-24.

Caremark, not what Rite Aid ultimately received.[111]  Put in Mr. Petron's own words: "[Mr. Petron's] analysis is based upon how much Centene overpaid, not how much Rite Aid received as a result of its usual and customary practice."[112]  There was evidence for the jury to conclude Centene did not adequately prove Rite Aid's enrichment.  What's more, given the weaknesses demonstrated therein, the jury was free to discredit Mr. Petron's analysis altogether.[113]

### 3.  *No JNOV Regarding Voluntary Payment*

Centene contends Rite Aid failed to prove Centene had full knowledge of Rite Aid's U&C reporting practices, and, therefore, Rite Aid failed to prove its voluntary payment defense.[114]  Rite Aid maintains substantial evidence supports the jury's finding that Rite Aid established Centene's voluntary payment.[115]

The voluntary payment doctrine evolved from unjust enrichment law.[116]  The doctrine bars recovery for "payment voluntarily made with full knowledge of the

---

[111] *See id.*; *see also id.* at 122-23.

[112] *Id.* at 131.

[113] *See Washington*, 4 A.3d at 381 (Ridgely, J., dissenting) ("Conflicts in the evidence, the determination of the credibility of the witnesses and the weight to be given their testimony are within the peculiar province of the jury."); *see also Beatty*, 2003 WL 23353491, at *3 (observing that even with unrebutted expert testimony, when there is a reasonable basis to conclude the opinions given were not reliable or credible, the jury may properly exercise its prerogative to reject that expert's testimony in whole).

[114] Centene Motion at 14.

[115] *See* Rite Aid Answer at 14.  Rite Aid, for its part, gave the voluntary payment issue short shrift in its briefing.

[116] *Intermec IP Corp. v. TransCore, LP*, 2021 WL 3620435, at *15 n.140 (Del. Super. Ct. Aug. 16, 2021) (citing *Home Ins. Co. v. Honaker*, 480 A.2d 652, 652-54 (Del. 1984)).

facts."[117]   The doctrine prevents the "counterparty from claiming that a 'misapprehension of its legal rights and obligations' caused it to make payments by mistake."[118]  Money "paid due to a mistake of law is not recoverable, while money paid under a mistake of fact may be recovered . . . under an unjust enrichment theory."[119]  This Court has considered voluntary payment to be a defense to unjust enrichment claims and breach-of-contract claims.[120]   At bottom, the existence voluntary payment is a factual inquiry.[121]

From the jury's perspective, based on the verdict form, the voluntary payment doctrine was relevant to only Centene's unjust enrichment claim, and only from December 23, 2016, until the filing of this action.[122]  Stated differently, because the jury found the statute of limitations applied, the voluntary payment doctrine stood to bar only the unjust enrichment claim.  As discussed above, the jury had a legally

---

[117] *W. Nat. Gas Co. v. Cities Serv. Gas Co.*, 201 A.2d 164, 169 (Del. 1964); *Intermec IP Corp.*, 2021 WL 3620435, at *15 (quoting *W. Nat. Gas Co.*, 201 A.2d at 169).

[118] *Intermec IP Corp.*, 2021 WL 3620435, at *15 (cleaned up) (quoting *Winshall v. Viacom Int'l, Inc.*, 2019 WL 960213, at *15 (Del. Super. Ct. Feb. 25, 2019)).

[119] *Home Ins. Co.*, 480 A.2d at 653.

[120] *Intermec IP Corp.*, 2021 WL 3620435, at *15 n.140 (citing *Winshall*, 2019 WL 960213, at *15; *Nieves v. All Star Title, Inc.*, 2010 WL 2977966, at *6-8 (Del. Super. Ct. July 27, 2010)).

[121] *See, e.g.*, *W. Nat. Gas Co.*, 201 A.2d at 169 ("The question is basically one of fact[.]"); *Intermec IP Corp.*, 2021 WL 3620435, at *16 ("The inquiry looks to the totality of the circumstances[.]").

[122] *See* Verdict Form at 36-37 (noting that if the jury found that no tolling exception applied to toll the statute of limitations, only claims from December 23, 2016, and forward remained viable, and also noting that part of Centene's unjust enrichment claim was the only claim for that circumscribed time period).

sufficient evidentiary basis to find Centene did not prove its unjust enrichment claim. A finding for Rite Aid on voluntary payment was, therefore, not dispositive; rather, the jury's finding further buttressed against Centene's unjust enrichment claim.

### 4. *No JNOV Regarding the Breach-of-Contract Claims*

Centene contends it should be granted JNOV on both the breach of the 2003 Contract claim and breach of the 2013 Contract claim.[123] But, counters Rite Aid, the jury found the statute of limitations barred both breach claims.[124]

The jury never reached Centene's breach claims on the verdict form because the jury's finding on the statute of limitations barred them. To grant Centene's JNOV request on the breach claims would in effect upend the entire verdict, reach questions the jury never did, and wholly accept and substitute in Centene's view of its claims. The Court finds no basis to do that. With respect to the claims and defenses discussed above, the Court has determined the verdict is "supported by palpable evidence."[125] The verdict, thus, "must be upheld."[126]

Centene's Motion for JNOV is **DENIED**.

---

[123] *See* Centene Motion at 11-12.

[124] *See* Rite Aid Answer at 10-11.

[125] *Deardoff Assocs., Inc.*, 2000 WL 1211130, at *2 (citing *Gannett Co., Inc.*, 496 A.2d at 557).

[126] *Id.* (citing *Gannett Co., Inc.*, 496 A.2d at 557).

## B. CENTENE IS NOT ENTITLED TO A NEW TRIAL.

Apart from JNOV, Centene alternatively requests a new trial. Centene says a new trial is necessary because (1) the jury's verdict is contrary to the great weight of the evidence, (2) Rite Aid's counsel made several improper comments, and (3) the Court's evidentiary rulings constitute plain legal errors "that resulted in an unfair trial and may have tainted the jury's verdict."[127] Rite Aid responds its comments were supported by the trial record and the Court's evidentiary rulings were sound.[128]

To reiterate, on a motion for a new trial under Civil Rule 59, "[t]he jury's verdict is presumed to be correct."[129] And that verdict is entitled to "enormous deference."[130] Indeed, the Court cannot set aside a jury's verdict unless, beyond doubt: (1) "it contradicts the great weight of the evidence"; (2) the "jury disregarded the applicable rules of law"; or (3) "the jury's verdict is tainted by legal error committed by the trial court before or during the trial."[131]

---

[127] Centene Motion at 15.

[128] Rite Aid Answer at 18.

[129] *Galindez v. Narragansett Hous. Assocs., L.P.*, 2006 WL 3457628, at *1 (Del. Super. Ct. Nov. 28, 2006); *see also Smack-Dixon v. Wal-Mart, Inc.*, 2023 WL 525062, at *1 (Del. Super. Ct. Jan. 25, 2023).

[130] *Young v. Frase*, 702 A.2d 1234, 1236 (Del. 1997); *see also Crist v. Connor*, 2007 WL 2473322, at *1 (Del. Super. Ct. Aug. 31, 2007) (citing *Young*, 702 A.2d at 1236).

[131] *Kelly*, 2002 WL 388120, at *4 (citing *Camper*, 401 A.2d at 465; *Castner*, 314 A.2d at 193; *DuPhilly*, 662 A.2d at 833-34).

-23-

## 1. *Centene Is Not Entitled to a New Trial Based on the Weight of the Evidence.*

Again, "[e]very analysis of a motion for a new trial must begin with the presumption that the jury verdict is correct."[132]  And the Court simply will not grant a new trial on weight-of-the-evidence grounds unless "the evidence preponderates so heavily against the jury verdict that a reasonable juror could not have reached the result."[133]  The Court has explained through the JNOV discussion, above, that is not so here. Centene's first ground for a new trial fails.

## 2. *Centene Is Not Entitled to a New Trial Based on Comments by Rite Aid's Counsel.*

Centene next contends Rite Aid's counsel made insinuations that the case was manufactured by Centene's trial counsel.  Centene complains these insinuations were improper and prejudicial[134] relying on *Putney v. Rosin*[135] for its argument.

*Putney* was a personal injury trial.[136]  In *Putney*, the plaintiff asserted a claim for personal injury arising from an assault committed by the defendant.  The jury returned a verdict for the plaintiff in an amount less than expected.[137]  The plaintiff

---

[132] *Smith v. Lawson*, 2006 WL 258310, at *6 (Del. Super. Ct. Jan. 23, 2006) (citing *Mills v. Telenczak*, 345 A.2d 424, 426 (Del. 1975)).

[133] *Amalfitano v. Baker*, 794 A.2d 575, 577 (Del. 2001) (quoting *Camper*, 401 A.2d at 465).

[134] Centene Motion at 15.

[135] 791 A.2d 902 (Del. Super. Ct. 2001).

[136] *See id.* at 903.

[137] *Id.*

moved for a new trial on two grounds: the verdict was against the great weight of the evidence; and the defense counsel made improper, prejudicial comments in his opening statement and closing argument.[138]  Centene relies on *Putney* for the improper-prejudicial- comments analysis.

This Court granted a new trial in *Putney*.  There, the defense counsel stated in closing argument that the plaintiff's attorney "manufactured" the plaintiff's claim, which this Court took as an implication that the plaintiff and his attorney fabricated the causal connection between the assault and the plaintiff's resulting health issues.[139]  The "manufactured" "argument [was] not supported by the record at all."[140]  And this Court found, in context, the comments were highly improper and prejudicial.[141]

This Court explained further in *Putney*: (1) the case was "clearly a close one," (2) the improper comments affected a central issue of causal connection between the assault and resulting health issues, and (3) the prejudice to the plaintiff was so strong that no mitigative efforts would've cured it.[142]  Resultingly, a new trial was

---

[138]  *Id.*

[139]  *Id.* at 905.

[140]  *Id.*

[141]  *Id.* at 906.

[142]  *Id.*

-25-

granted.[143]

Centene contends this case is like *Putney* and focuses primarily on Rite Aid's

counsel's closing argument that included the following:

- "The beauty of the jury system is that . . . [i]t allows you to judge what the parties knew in real time as compared to telling you a whopper of a story after being propped up by lawyers with an interest in this case."[144]

- "The only person who cared are these lawyers, and the legal department at Centene said let's turn it into something."[145]

- "It's really insulting isn't it, to hear from Mr. Correia and the Rite Aid witnesses as to how the contract worked between Caremark and Rite Aid? And then to have them come in – dozens of lawyers come in and try to say it isn't what those witnesses say, it isn't what the contracts say. You should throw them out. And by putting no on [the verdict form], you do that."[146]

- "[Centene] might have come in and said they didn't know everything. Come on. They knew plenty. And voluntary payment means you knew enough and you kept paying the same way. I'm not going to let you come back once you let – once you got lawyers and change that decision. The business people were perfectly happy with the deal they cut. Only the lawyers don't like it. So you [write] yes on that [verdict form] when you get to Section D."[147]

- "The record shows the Centene-Envolve business people are [ec]static with the deal they've covered and handled their claims back then. They had no complaints. But now after the fact here come the lawyers, not the business people."[148]

---

[143] *Id.* at 907.

[144] May 22, 2023 Trial Transcript ("May 22 Trial Tr.") at 69 (D.I. 365).

[145] *Id.* at 92.

[146] *Id.* at 121.

[147] *Id.* at 121-22.

[148] *Id.* at 124-25.

- "Tell those lawyers that before you waste a jury's time read your contracts ahead of time. Tell Centene no. It's a money grab, it's always been a money grab. Now Rite Aid needs your help to tell Centene no."[149]

Interestingly, while these comments are now called out individually and collectively as grounds for a new trial, not one contemporaneous objection was made about them during closing argument. The first complaint on such was made via this new trial motion. So, the Court's opportunity to cure any supposed error that might scuttle the work of the parties, the Court, and the jury in real time was wasted. Instead, Centene's counsel sat on their hands in the face of what is claimed to be obvious, verdict-tainting behavior during closing only to pull them out now to pen this motion when no possible curative action is available. That's not only disappointing, it's improper trial and motion practice.[150]

---

[149] *Id.* at 126.

[150] *See Koutoufaris v. Dick*, 604 A.2d 390, 400 (Del. 1992) ("[T]he failure of opposing counsel to make a contemporaneous objection deprived the trial judge of the opportunity to deal with the problem *when it arose.* Such inaction is deemed a waiver of any resulting error for appellate purposes." (emphasis added)); *Med. Ctr. of Delaware, Inc. v. Lougheed*, 661 A.2d 1055, 1060 (Del. 1995) ("A party must timely object to improper statements made during closing argument in order to give the trial court the opportunity to correct any error."); *Gen. Motors Corp. v. Grenier*, 981 A.2d 531, 541 n.27 (Del. 2009) ("This Court has consistently required that any objections be made contemporaneously."); *see also Cohen-Thomas v. Lewullis*, 2016 WL 721009, at *4 (Del. Super. Ct. Jan. 29, 2016):

> Despite their failure to object at trial, Plaintiffs now come before the Court urging that a legal error occurred . . . . Were the Court to grant this Motion, the practical effect of Plaintiffs' conduct is that Plaintiffs could make a strategic decision not to object at trial with the hope of receiving a favorable verdict, but if Plaintiffs received an unfavorable jury verdict, they would be assured of a new trial before a new jury with the possibility of a different outcome. The Court will not retroactively cure any perceived mistake created by trial counsel's failure to object at trial.

Centene also takes issue with Rite Aid referring to this action in opening as a "recovery opportunity,"[151] and Rite Aid's reference during trial to "a law firm based in Washington, D.C., a large law firm."[152]

Centene's argument that this case is like *Putney* is off base. In *Putney*, the defense counsel's comment that the claim was "manufactured" was one "not supported by the record at all."[153] Rite Aid's counsel's comments while perhaps not all praisable were, by contrast, supported by the record.

Regarding the "lawyer" comments, Michael Baca, Health Net's former senior vice president of pharmacy networks and a Centene witness,[154] testified regarding Centene's legal department. Namely, Rite Aid's counsel asked Mr. Baca how Mr.

---

*Broughton v. Wong*, 2018 WL 1867185, at *8 (Del. Super. Ct. Feb. 15, 2018) (explaining that "[p]arties must make contemporaneous objections at trial" and noting that granting the relief of new trial citing unobjected-to evidence or events provides "a retroactive cure that could encourage gamesmanship").

Centene's resort to this Court's recent decision in *Conduent State Healthcare, LLC v. AIG Specialty Insurance Co.*, 2023 WL 2256052 (Del. Super. Ct. Feb. 14, 2023), for the proposition it should be excused from the contemporaneous-objection rule is unavailing. In *Conduent*, the Court noted that although plaintiff's counsel did not object during closing argument, plaintiff's earlier objections on the specific issue were preserved in that instance. 2023 WL 2256052, at *5. But the exceptionality of the circumstances in *Conduent* are thoroughly explained by the trial judge and probably best condensed to her simple opening sentence: "In almost 20 years on this bench, I have never set aside a jury verdict." *Id.* at *4-12, *1. This Court's decisions in *Cohen-Thomas* and *Broughton* are more instructive here.

[151] *See* Centene Motion at 16; May 8, 2023 Trial Transcript ("May 8 Trial Tr.") at 129-31 (D.I. 347).

[152] *See* Centene Motion at 16; *see, e.g.*, May 9, 2023 Trial Transcript ("May 9 Trial Tr.") at 134, 94-102 (D.I. 367).

[153] *Putney*, 791 A.2d at 905.

[154] May 8 Trial Tr. at 142.

Baca heard Rite Aid was excluding its Program prices from its U&C reporting practices.[155]  Mr. Baca responded Centene's "internal legal department came to [Mr. Baca] with some concerns."[156]  Mr. Baca testified he had not heard of any issues and had no concerns regarding Rite Aid's reporting practices before that time.[157]  Additionally, regarding the "law firm" comments, Mr. Baca agreed Health Net was assisted by a "large Washington, D.C. law firm" in its negotiations with Caremark.[158]  Finally, regarding the "recovery opportunity" comments, Tim Emert, Centene's corporate representative, agreed Centene "expected a recovery" and agreed this lawsuit was a "recovery opportunity."[159]  Rite Aid's counsel's statements were supported by the record.

Make no mistake, the Court is not holding up each of Rite Aid's closer's statements (or the delivery thereof) as exemplary or laudable.  But even if Rite Aid's counsel's comments were found improper, a new trial is not *per se* warranted.  To "determine whether a new trial is called for in connection with improper comments, the trial court must determine whether the improper comments prejudicially affected

---

[155]  May 9 Trial Tr. at 88.

[156]  *Id.*

[157]  *Id.* at 89, 139.

[158]  *Id.* at 134-35, 137-38.

[159]  May 10 Trial Tr. at 55-56.

[Centene's] substantial rights."[160] The Court must now consider: "(1) the closeness of the case, (2) the centrality of the issue affected by the improper comments, and (3) steps taken in mitigation."[161]

It seems in the jury's collective mind, this case was not close—the verdict form reflects that. The jury found for Rite Aid in every possible way. Specifically, the jury found: Centene did not prove an exception tolled the statute of limitations; Centene did not prove its unjust enrichment claim; and Rite Aid proved Centene's claims were barred by the voluntary payment doctrine.[162] While Centene posits the jury's findings can't be trusted in light of the complained-of closing statements, there was real and credible record evidence supporting each facet of those verdicts.

Centene suggests the Court's denial of both parties' motions for directed verdict at the close of the evidence alone demonstrates this was a close case.[163] Not so. The Court denied those motions because "[s]o much of this [case] relie[d] on the credibility of the witnesses."[164] The first factor does not weigh in favor of a new trial.

The centrality-of-the-issue factor also does not weigh in favor of a new trial.

---

[160] *Putney*, 791 A.2d at 905 (citing *Hughes v. State*, 437 A.2d 559, 571 (Del. 1981)).

[161] *Id.* (citing *Hughes*, 437 A.2d at 571).

[162] *See generally* Verdict Form.

[163] Centene Motion at 20.

[164] May 19 Trial Tr. at 32.

For its part, Centene's argument on this factor is unclear. Centene argues Rite Aid's defense strategy was to claim this case was "manufactured" by lawyers.[165] Rite Aid never used the term "manufactured"; Centene pulled that word from *Putney*, which the Court has stated is distinguishable from this case. Centene says Rite Aid's comments were aimed at deflecting from the claims and defenses at issue.[166] Centene, again, analogizes *Putney* and says Rite Aid was playing on the public's bias against the legal profession.[167] The Court disagrees. At bottom, this was a case about contracts, breaches, unjust enrichment, and defenses. The comments of which Centene now complains were not central to the issues before the jury.

The final factor—steps taken in mitigation—does not weigh in favor of a new trial. Even though Centene prevented more targeted mitigation (if needed), the jury was still instructed immediately after the comments now challenged:

> What the attorneys say is not evidence. Instead, whatever they say is intended to help you review the evidence presented. If you remember the evidence differently from the attorneys, you should rely on your own recollection.
>
> The role of attorneys is to zealously and effectively advance the claims of the parties they represent within the bounds of the law. An attorney may argue all reasonable conclusions from evidence in the record. It is not proper, however, for an attorney to state an opinion as to the truth or falsity of any testimony or evidence. What an attorney personally thinks or believes about the testimony or evidence in a case

---

[165] Centene Motion at 20.

[166] *See id.* at 20-21.

[167] *Id.* at 21 (citing *Putney*, 791 A.2d at 906).

is not relevant, and you are instructed to disregard any personal opinion or belief offered by any attorney concerning testimony or evidence.[168]

For this factor, Centene again compare this case to *Putney*, where this Court stated "[a]n accusation in the presence of the jury that the plaintiff's attorney has manufactured the plaintiff's claim so taints the fairness of the proceeding that no instruction can dispel the prejudice."[169] But again, this case is unlike *Putney*. Rite Aid's counsel's comments were tied to trial evidence and were not, from the Court's perspective, merely some unmoored attempt to play on any negative public sentiment against the legal profession. This final factor does not favor a new trial.

Centene is not entitled to a new trial based on Rite Aid's counsel's comments.

### 3. *Centene Is Not Entitled to a New Trial Based on Its Suggestion of Legal Error—i.e., an Improperly Curtailed Cross-Examination.*

#### a. Brian Correia's Testimony

Centene contends it was prevented from fairly cross-examining Mr. Correia. During trial, Mr. Correia was asked by Centene's counsel: "And you're providing this voluntary testimony for Rite Aid because you and your employer [i.e., Caremark and its parent, CVS] have decided it's in your interest to do so; right?"[170] Mr. Correia responded: "I was asked to do so, and I willingly came."[171] It appears Centene was

---

[168] Jury Instructions at 28 (D.I. 352).

[169] *Putney*, 791 A.2d at 906.

[170] May 11 Trial Tr. at 69.

[171] *Id.*

attempting to elicit an answer to show Mr. Correia, in Centene's estimation, was biased for Rite Aid.[172] After Mr. Correia responded with the above, Centene sought to impeach Mr. Correia with a purported prior inconsistent statement from a deposition in a different case.[173] The deposition transcript from the other case contained the following question and answer: "Q[:] . . . . You and your company decided that it was in your interest to provide that declaration supporting Rite Aid's position in this [i.e., the other] case. Right? A: Yes."[174]

Rite Aid objected, arguing there was no basis to impeach Mr. Correia.[175] The Court sustained the objection, noting the deposition did not demonstrate the bias or prejudice Centene claimed, and further noting its concern that the deposition was from a different case with different claims.[176]

Delaware Rule of Evidence ("DRE") 607 states that "[a]ny party . . . may attack the witness's credibility."[177] DRE 616 states that "[a] witness's credibility may be attacked with evidence of the witness's bias, prejudice or interest for or against any party to the case."[178] It's within the trial judge's discretion to permit or

---

[172] *See* Centene Motion at 23.

[173] May 11 Trial Tr. at 69.

[174] Centene Motion, Ex. 1 at 16.

[175] May 11 Trial Tr. at 69.

[176] *Id.* at 72-73.

[177] DRE 607 (2023).

[178] DRE 616 (2023).

deny certain types of cross-examination.[179]  But, a judge may not "exercise this discretion so as to defeat a party's right to effective cross-examination."[180]  "To properly evaluate a witness, a jury must have sufficient information to make a discriminating appraisal of a witness's motives and bias.  It is an abuse of discretion for a judge to cut off cross-examination if the opportunity to present this information is not afforded."[181]  As highlighted in *Garden v. Sutton*,[182] the Delaware Supreme Court "has established criteria to guide judicial discretion in this area."[183]  The trial court must consider:

> (1) whether the testimony of the witness being impeached is crucial;
> (2) the logical relevance of the specific impeachment evidence to the question of bias; (3) the danger of unfair prejudice, confusion of issues, and undue delay; and (4) whether the evidence of bias is cumulative.[184]

Mr. Correia's testimony was, without doubt, important.  Rite Aid argued to the jury that Rite Aid and Caremark both understood Program prices were not included as U&C under the Caremark Contract.  Mr. Correia was the only Caremark representative to testify in this case.  Rite Aid says Mr. Correia's testimony was less

---

[179] *See Garden v. Sutton*, 683 A.2d 1041, 1043 (Del. 1996); *Milton v. State*, 2013 WL 2721883, at *5 (Del. June 11, 2013).

[180] *Garden*, 683 A.2d at 1043.

[181] *Id.* (cleaned up) (quoting *Douglas v. Owens*, 50 F.3d 1226, 1230 (3d Cir. 1995)).

[182] 683 A.2d 1041 (Del. 1996).

[183] *Id.* (citing *Snowden v. State*, 672 A.2d 1017, 1025 (Del. 1996); *Weber v. State*, 457 A.2d 674, 681 (Del. 1983)).

[184] *Snowden*, 672 A.2d at 1025 (quoting *Weber*, 457 A.2d at 681).

crucial because other witnesses testified in step with Mr. Correia on this point.[185] But those witnesses were Rite Aid employees, not Caremark employees.[186] Although Mr. Correia's testimony was not inconsistent with Rite Aid's witnesses' testimony, the Court still finds his testimony was, in *Garden* terms, "crucial" because he was the only Caremark representative to testify regarding Caremark's understanding of the Caremark Contract.[187]

The purported impeachment evidence's logical relevance to the question of bias, though, favors Rite Aid. The Court observed when ruling on Rite Aid's objection that there might be an argument of "some, quote, positional or subject matter bias" but naturally then there was grave concern because the excerpt on which Centene wanted to inquire related to "different claims in a different case."[188]

All agree, Mr. Correia's transcript from the other case involved different parties and different claims. And the only potential "bias" that Centene suggests is that Mr. Correia might—because the parent company (CVS) of his own employer (Caremark) faces U&C allegations like Centene's against Rite Aid—take a position

---

[185] Rite Aid Answer at 29.

[186] Rite Aid cites testimony of William Wolfe, Ruth Lightner, and Luke Barnes. *See* Rite Aid Answer at 29.

[187] *See, e.g.*, *Adams v. Aidoo*, 2012 WL 1408878, at *17 (Del. Super. Ct. Mar. 29, 2012) ("Where a witness was the only eyewitness to a cause of action, besides the opposing party, and the parties' version of events at issue at odds, a case turns on a credibility assessment. In such a case, that witness's testimony is crucial to the disposition of the case." (internal citations omitted)).

[188] May 11 Trial Tr. at 72.

favorable to Rite Aid on how U&C is interpreted. First, the jury had already heard the question-and-answer Centene posed. Mr. Correia's trial answer here was consistent with the deposition in the other litigation. Centene wanted to delve deeper. But in the Court's view, then and now, the logical relevance of the foreign deposition in proving either bias or inconsistency was minimal.

Third, and most important for the circumstances here, the deposition testimony's probative value for bias was substantially outweighed by the danger of confusing the issues. The Court made clear, based on a concern of confusing the issues, that even though the parties "may have tons of history with these various cases . . . we're going to talk about this case."[189] And unlike garden-variety bias evidence, a limiting instruction would have been inadequate to guide the jury through the morass that would have been created by entry of this prior deposition excerpt.[190] That's because any such instruction would have done little to ease the confusion and possible prejudice that could occur by opening the issue of other U&C lawsuits against Rite Aid and other pharmacies.

---

[189] *Id.* at 72-73.

[190] *Cf. Garden*, 283 A.2d at 1044 ("Confusion of the issues does not present a problem as long as a proper limiting instruction is given confining the jury's consideration of the evidence to the question of credibility."). *Garden* concerned a motor vehicle accident. This case, by contrast, involved dozens of parties and numerous contractual terms that made the case, on the whole, a complicated one. For this reason, the Court required the parties to focus on this case, not the various other cases involving the parties.

Fourth, Mr. Correia had already stated he was testifying in this trial voluntarily because he "was asked to do so [by his employer], and [] willingly came," so questioning him on his answer in the earlier unrelated deposition was cumulative. That said, if, as it has always appeared, Centene again wanted to get aspects of that other litigation before this jury then that presentation was not strictly speaking cumulative.

Giving each factor its appropriate weight, the Court at trial and now finds the danger of confusing the issues was paramount in excluding Mr. Correia's deposition testimony from the other case. Additionally, the Court finds there was little relevance to the deposition. Excluding the deposition transcript, therefore, was proper.[191]

### b. William Wolfe's Testimony

Mr. Wolfe testified for Rite Aid in this case.[192] To reiterate, Mr. Wolfe was a Rite Aid employee from 1998 until 2011 and worked as Rite Aid's senior vice

---

[191] Centene also argues that the Court erred in excluding Mr. Correia's deposition from the other case for another reason—the deposition somehow demonstrated Mr. Correia's purported lack of candor. Centene Motion at 26. Here, Centene charges Mr. Correia essentially lied to the jury. Mr. Correia was asked why he flew across the country to testify at trial. *See* May 11 Trial Tr. at 62. Mr. Correia responded: "Well, the document that I believe is relevant to the case, I was the author of. You know, Centene is one of [Caremark's] largest clients; Rite Aid is a provider in our network; I felt I should be here." *Id.* at 63. In Centene's singular view, Mr. Correia came to testify in a self-serving capacity. Centene Motion at 26-27. But Centene's own-held conjecture adds nothing of substance to determining the admissibility of the evidence it claims was wrongly excluded.

[192] May 18 Trial Tr. at 7.

president of managed care and government affairs.[193]  Rite Aid's counsel asked

Mr. Wolfe if he was aware, when the Program was conceptualized, of possible

challenges to U&C pricing by payors.[194]  Mr. Wolfe responded:

> I was aware that there was a risk that payors would use any angle they could to reduce generic reimbursement, and one of those vehicles would be to change the definition of usual and customary, which, unfortunately, FEP did, but no other PBMs or payors during my time at Rite Aid, before or after or since had suggested that [the Program] was U&C.[195]

Centene took issue with Mr. Wolfe's response and sought to question

Mr. Wolfe about a document that purported to show Rite Aid was submitting

Program prices as U&C to State Medicaid agencies, which allegedly contradicted

Mr. Wolfe's testimony.[196]  During sidebar, the Court asked Centene's counsel if the

document related to PBM and/or payor contracts, or if it related to only State

Medicaid agencies' contracts; in context, the Court's real-time interpretation was

that Mr. Wolfe was testifying about only PBM contracts.[197]  Centene's counsel stated

the document related to State Medicaid agencies' contracts.[198]  The Court excluded

the evidence because Mr. Wolfe was referring to contracts with PBMs, not contracts

---

[193]  *Id.* at 8-9.

[194]  *Id.* at 139-40.

[195]  *Id.* at 140.

[196]  *See id.* at 234-35.

[197]  *Id.* at 236.

[198]  *Id.*

with State Medicaid agencies that are affected by state regulations.[199]   In other words, the contracts with PBMs and the contracts with State Medicaid agencies were "wholly different."[200]

Centene now argues that it was prevented from "fairly addressing a misleading inaccuracy" in Mr. Wolfe's testimony highlighted above.[201]

Mr. Wolfe's testimony was not misleading or inaccurate.  Mr. Wolfe testified about PBMs,[202] not State Medicaid agencies.  Mr. Wolfe's testimony, thus, was not inconsistent, and Centene had no basis to impeach him.

### c.  Evidence of Centene's Business and Client Base

Centene's next proffered basis for a new trial is a charge that Rite Aid's counsel repeatedly made "inflammatory comments" regarding Centene's business and financial position while the Court prohibited Centene from fairly responding.[203] Centene complains Rite Aid's counsel was permitted to call Centene "a large public corporation" "seeking a huge amount of money," a "gargantuan insurance company"

---

[199]  *Id.* at 236-37.

[200]  *Id.* at 237.

[201]  Centene Motion at 27.

[202]  *See, e.g.*, May 18 Trial Tr. at 61-62; *see also id.* at 80 ("Well, I [i.e., Mr. Wolfe] think we've already established that there was one program and one program only, FEP, where there was a specific conversation around U&C including [Program] price, and in all other instances, during my entire tenure and throughout the PBMs and so forth since I left Rite Aid, in no instance has a retail discount card that includes enrollment and adjudication been passed as U&C on any PBM contract that I'm aware of.").

[203]  Centene Motion at 28.

seeking "a huge windfall," and a "greedy" company "trying to cash in."[204] Centene then argues it suffered prejudice because it wasn't permitted to respond with evidence that many of its members are Medicaid, Medicare, and Affordable Care Act members; and Centene provides healthcare services to the elderly and underprivileged.[205]

There are two issues with Centene's argument. First, as it relates to Rite Aid's counsel's remarks during his opening statement and closing argument, again, Centene didn't object once. Because Centene did not object, its argument on these comments is waived.[206] Second, the Court clarified its rulings on this issue the first day of trial (and before)—Centene could not present generalized argument or evidence of Centene's ties to Medicare and Medicaid if the evidence was not relevant to the issues in this case because doing so implicated the "golden rule."[207]

---

[204] *See id.* at 30

[205] *Id.* at 28-29.

[206] *See Grenier*, 981 A.2d at 541 n.27 ("[The Supreme] Court has consistently required that any objections be made contemporaneously. Failure to do so waives any claim of error."); *see also Permint v. Kia Motors Am., Inc.*, 2022 WL 2444755, at *3 (Del. Super. Ct. July 1, 2022) (citing *Wolhar v. Gen. Motors Corp.*, 1998 WL 472785, at *3 (Del. Super. Ct. July 1, 1998)); *Plant v. Rosado*, 2012 WL 2107114, at *3 (Del. Super. Ct. June 4, 2012) ("[T]he Court notes that plaintiffs' counsel did not object to defense counsel's closing argument. He has, therefore, waived the [objection]." (citing *Grenier*, 981 A.2d at 541)).

[207] *See Delaware Olds, Inc. v. Dixon*, 367 A.2d 178, 179 (Del. 1976) ("[A] 'golden rule argument' is where counsel asks the jury to place themselves in the shoes of a party to the suit in arriving at a verdict, and to render such verdict as they would want rendered in case they were similarly situated." (cleaned up) (citation omitted)).

Allowing Centene to present untethered argument or evidence of its customer base and ties to Medicare and Medicaid, in these circumstances, risked violating now well-known and accepted proscriptions.  On that, our Supreme Court has instructed "it is universally held that [a golden rule] argument is improper and will constitute reversible error."[208]  In the Court's view, allowing such argument and  evidence— absent direct tie to the specifics of this case—would also run afoul of DRE 403 because the probative value of Centene's motives for highlighting its customer base

---

The Court explained its particular concern on this issue thusly:

> Well, if there's a direct contract reason why [Centene's connection to Medicare and Medicaid] is relevant then that will be discussed with the witness at the time.  As I've said before, I think it's pretty clear what I don't want to have happen is that all of a sudden there is the [suggestion], ["H]ey, folks, you in the box, we're representing you.["]  You're [Centene] not.  You're representing insurance carriers who, or health care plans now, seeking to recoup money.  No, there is no individual client of those companies that is a party in this case, so I want to be very clear about, as I said, backdoor violating [of] the golden rule.
>
>          *               *               *
>
> Nobody is saying that Medicaid and Medicare are dirty words in this trial. . . . [W]hat I want to ensure is I do not want plaintiffs basically up there saying[, "W]e're doing this for you and for all Medicaid and Medicare customers or patients[." B]ecause that's not true, that's not happening.  You're not—there is not one thing in this complaint about returning money to anyone other than these corporations [the PBMs], that's what this case is about.  So, to the extent that things have to be mentioned because they are part of the contract, they do.  What I don't want is, again . . . somehow trying to place jurors in the place or their loved ones in the places [of Centene or its clients] because we never asked them about any of that[. W]e never asked them[, "D]o you rely on Medicaid or Medicare or do your loved ones do that.["]  This is [] about a contract dispute and it's about whether or not this corporation [Rite Aid] pays . . . those corporations [Centene entities] money and that's it, okay?

May 8 Trial Tr. at 136-37.

[208]  *Delaware Olds, Inc.*, 367 A.2d at 179 (citation omitted).

was substantially outweighed by the danger of, at least, unfair prejudice and misleading the jury.[209]

Centene's last legal-error argument takes aim at Rite Aid's counsel's comments during closing relating to the fact that Centene was seeking pre-judgment interest.[210] Centene objected. The Court sustained the objection, struck the comments from the record, and instructed the jury to disregard those comments.[211] Even so, Centene now argues "the damage was done, the fairness of the trial was undermined, and no instruction could rectify the prejudice."[212] Not so. "[T]o cure the prejudicial effect of [] improper comments. . . . [g]enerally, a curative instruction adequately mitigates any prejudice."[213] That's what happened here.

### 4. *Centene Is Not Entitled to a New Trial Based on Rite Aid's Counsel's Other Comments.*

Centene advances two final grounds for a new trial: (1) Rite Aid's counsel used the Court's March 2023 summary judgment Memorandum Opinion and Order "as substantive evidence"; and (2) Rite Aid's counsel, during closing argument,

---

[209] *See* DRE 403 (2023).

[210] Centene Motion at 30.

[211] May 22 Trial Tr. at 145.

[212] Centene Motion at 30.

[213] *Estate of Swan v. Balan*, 956 A.2d 1222, 1226 (Del. 2008) (citing *Dunn v. Riley*, 864 A.2d 905, 909 (Del. 2004)); *Revel v. State*, 956 A.2d 23, 30 (Del. 2008) ("We have held that an error can normally be cured by the use of a curative instruction to the jury, and that jurors are presumed to follow those instructions." (cleaned up)); *Pena v. State*, 856 A.2d 548, 551 (Del. 2004) (holding that "[p]rompt jury instructions are presumed to cure error and adequately direct the jury to disregard improper statements").

"seized upon" a comment made by the Court during the prayer conference regarding prescription drug co-pays.[214] Either taken alone, or both taken together, "unfairly prejudiced" Centene, so it says.[215] Rite Aid says neither merits relief. On the first complaint, Rite Aid recounts that: before trial, the Court approved the use of the phrase "the law applicable to this case" to refer to earlier rulings as necessary; the Court explained then that it would take up objections on its specific use as presented during trial; and Centene did not object when Rite Aid used it.[216] On the second point, Rite Aid says the record itself supports its co-pay statement, as does the jury's common sense.[217]

Centene provides not a single citation to law—in either its opening or reply brief—in support of this claimed error.

Regarding Centene's first argument, Centene fails to identify where it ever objected when Rite Aid employed the term "the law applicable to this case" at trial. Centene points out the Court rejected a Centene-proposed limiting instruction regarding the March 2023 summary judgment Opinion on the first day of trial.[218]

---

[214] Centene Motion at 32-34.

[215] *Id.*; Centene's Reply Brief for Judgment Notwithstanding the Verdict Or, Alternatively, for a New Trial at 17-19 (D.I. 378).

[216] Rite Aid Answer at 37.

[217] *Id.* at 38-39.

[218] Centene Motion at 32.

True, the Court proposed, instead, the parties create a stipulation for the jury.[219] They never did so. But that is neither here nor there. Because what again is dispositive is Centene never objected to Rite Aid's use of the phrase "the law applicable to this case" during trial, despite pretrial instructions to do so if counsel believed at any specific point in trial it's use was improper.[220] Failure to object then is fatal to Centene's argument now.[221]

Regarding Centene's second argument, the trial record and common sense supported Rite Aid's counsel's statement during closing argument that "I'll bet you [i.e., the jury] know from your experience $10 is a pretty common co-pay, isn't it?"[222] Rite Aid's counsel made that statement in reference to Michael Petron (Centene's damages expert)'s testimony.[223] Mr. Petron testified his calculation

---

[219] May 8 Trial Tr. at 19-20.

[220] May 5, 2023 Pretrial Conference at 57, 60-62 (noting that the parties were to use "under the law applicable in this case" to refer to earlier rulings as necessary, and instructing the parties to object as necessary during trial so the Court could "make a ruling in the context of what is going on at the time" because the Court needed to evaluate "an objection made in the context of that specific witness" and that specific testimony) (D.I. 381).

[221] *See supra* note 150; *see also Tilson v. Lutheran Senior Servs., Inc.*, 2013 WL 6596959, at *4 (Del. Super. Ct. Dec. 12, 2013) (observing on a motion for new trial: "The waiver rule is intended to afford a trial court the immediate opportunity to correct any trial error. The rule fosters the efficient trial of cases by ensuring that the Court may contemporaneously address any objectionable statement or conduct, either with a curative instruction or otherwise." (internal citations omitted)).

[222] May 22 Trial Tr. at 103.

[223] *See id.* at 102-03.

relied on "the amount paid by the patient at the time of sale," which was either "the retail value for cash customers [or] . . . the copay or patient pay amount."[224]

Mr. Petron also testified:

> I examined the cash transactions and identified those instances in which the amount paid by the individual at the point of sale matched one of the known Wal-Mart advertised prices of $4 or $10. . . . There was lots and lots of transactions at four and ten dollars, and so those are the transactions I considered to be price matching.[225]

Additionally, the jury was instructed: "You [i.e., the jury] are allowed to draw reasonable conclusions from the testimony and exhibits, if you think those conclusions are justified. In other words, use your common sense to reach conclusions based on the evidence."[226]

As this Court has previously explained when resolving an "improper comments" issue:

> While jurors may generally not substitute their own judgment in areas where expert testimony is required, they clearly are allowed to assess the credibility of that witness and are free to decide to what extent they will accept the testimony. In performing this function, the jury is expected to use their common sense and counsel was asking nothing more of them. . . . the arguments made by counsel were not improper.[227]

---

[224] May 16 Trial Tr. at 86.

[225] *Id.* at 139.

[226] Jury Instructions at 1-2; *see also Smith v. State*, 317 A.2d 20, 23 (Del. 1974) ("Jurors are expected to use all the experience, common sense and common knowledge they possess.").

[227] *Thomas v. Lagola*, 2003 WL 22496355, at *2 (Del. Super. Ct. Oct. 31, 2003).

Just the same here. The jury was urged to employ its common knowledge and common sense when assessing whether Mr. Petron's analysis might rely on some faulty assumptions—that every $10 transaction was a price-matched sale. Centene suffered no unfair prejudice as a result.

In sum, no legal-error claim Centene forwards in its quest for a new trial merits one. That is, Centene has not shouldered its heavy burden of demonstrating that the jury's verdict is tainted by legal error committed before or during the trial.[228]

Centene elected to pursue a jury trial. Centene had just that. "When the parties activate the jury trial system, they activate the risk inherent in the system. And, of course, trials by jury implicate the most risky element of dispute resolution—uncertainty."[229] The Court cannot now rescue Centene from the snares found along the risky venture it set upon. And "the judicial system cannot and should not make litigation risk-free."[230]

Centene's Motion for a new trial is **DENIED**.

## C. RITE AID IS ENTITLED TO COSTS.

Rite Aid requests the Court award costs against Centene.[231] Rite Aid seeks:

---

[228] *O'Riley*, 69 A.3d at 1010 (stating that to grant a new trial on these grounds the Court must first find legal error and "must then determine whether the mistakes constituted significant prejudice so as to have denied the [complaining party] a fair trial").

[229] *Dunkle v. Prettyman*, 2002 WL 833375, at *3 (Del. Super. Ct. May 1, 2002); *Galindez*, 2006 WL 3457628, at *2 ("That is the nature of the beast.").

[230] *Dunkle*, 2002 WL 833375, at *3 (cleaned up) (citation omitted).

[231] *See* Motion for Costs.

(1) Court, filing, and electronic service fees; (2) service of process; and (3) trial technology fees.[232] Centene, generally, does not oppose Rite Aid's Motion.[233] Instead, Centene argues Rite Aid's Motion is premature because Centene believes it's entitled to JNOV or a new trial.[234] Because the Court has found Centene is entitled neither to JNOV nor a new trial, it will now address Rite Aid's request for costs.

To reiterate, Superior Court Civil Rule 54(d) provides "costs shall be allowed as of course to the prevailing party upon application to the Court within ten (10) days of entry of final judgment unless the Court otherwise directs."[235] Awarding costs is a matter of judicial discretion,[236] but the prevailing party is generally entitled to costs.[237] There are few circumstances where the Court will deny an award of costs to the prevailing party; for instance, if the jury finds both parties equally or nearly equally liable.[238] Otherwise, the prevailing party is typically entitled to costs as a

---

[232] *See id.* at 2-3.

[233] *See* Centene's Answering Brief in Opposition to Rite Aid's Motion for Costs ("Centene Answer") at 1 (D.I. 376).

[234] *Id.*

[235] Del. Super. Ct. Civ. R. 54(d).

[236] *Phelps*, 2018 WL 1341704, at *1 (citing *Olson*, 2014 WL 1325909, at *1).

[237] *Id.* (citing *Bodley*, 65 A.2d at 487).

[238] *See, e.g.*, *Nelson v. Feldman*, 2011 WL 531946, at *1 (Del. Super. Ct. Jan 26, 2011) (finding the defendant 49% liable and the plaintiff 51% liable). Although *Nelson* is an automobile collision case, it is illustrative of when this Court may deny costs. *See id.* at *2.

matter of right.[239]

In this case, Rite Aid ran the table. So, now the Court must consider what costs to award to Rite Aid.

Regarding Rite Aid's Court, filing, and electronic services fees, Rite Aid requests $2,089.75.[240] Court fees, filing fees, and electronic service fees are generally recoverable.[241] Centene does not dispute Rite Aid's calculations of these costs, so the Court awards Rite Aid $2,089.75 for these fees.[242]

Regarding Rite Aid's service of process costs, Rite Aid requests $563.17.[243] Service of process fees are also generally recoverable.[244] Centene does not dispute Rite Aid's calculations of these costs.[245] The Court, therefore, awards $563.17 for these fees.[246]

Regarding trial technology fees, Rite Aid requests $12,528.75.[247] This Court

---

[239] *Phelps*, 2018 WL 1341704, at *1 (citing *Bodley*, 65 A.2d at 487).

[240] Motion for Costs at 3; *see also id.*, Ex. 1.

[241] *In re Bracket Hldg. Corp. Litig.*, 2020 WL 764148, at *11 (Del. Super. Ct. Feb. 7, 2020) (citing *Dewey Beach Lions Club v. Longacre*, 2006 WL 2987052, at *2 (Del. Ch. Oct. 11, 2006)).

[242] *See id.* ("As Defendants do not dispute [Plaintiff's] calculations of [court fee, filing fee, and electronic service fee] costs, the Court will allow them in the [total] amount [requested].").

[243] Motion for Costs at 3; *see also id.*, Ex. 2.

[244] *In re Bracket Hldg. Corp. Litig.*, 2020 WL 764148, at *12 (citing *Moyer v. Saunders*, 2013 WL 4138116, at *1 (Del. Super. Ct. July 24, 2013)).

[245] *See* Centene Answer at 1.

[246] *In re Bracket Hldg. Corp. Litig.*, 2020 WL 764148, at *12 (awarding fees for service of process costs that the other party did not dispute).

[247] Motion for Costs at 3; *see also id.*, Ex. 3.

permits recovery of reasonable trial technology fees.[248]  Rite Aid's trial technology support staff significantly aided Rite Aid throughout the presentation of the evidence at trial.  And Centene does not dispute Rite Aid's calculations of these costs.[249]  As such, the Court awards Rite Aid $12,528.75 for these fees.

Rite Aid's Motion for costs is **GRANTED**.  In total, the Court awards Rite Aid $15,181.67 in costs.

## V.  CONCLUSION

For the foregoing reasons, Centene's Motion for JNOV is **DENIED** in full; Centene's Motion for alternative relief in the form of a new trial is **DENIED**; and Rite Aid's Motion for costs is **GRANTED**.

**IT IS SO ORDERED**.

_____
Paul R. Wallace, Judge

---

[248] *See, e.g.*, *In re Bracket Hldg. Corp. Litig.*, 2020 WL 764148, at *13 ("This Court will allow recovery only to the extent of the cost of technology support services that were provided during trial."); *TranSched Sys. Ltd. v. Versyss Transit Sols., LLC*, 2012 WL 1415466, at *5 (Del. Super. Ct. Mar. 29, 2012) (awarding $14,801 as "technical support staff" costs because plaintiff's "trial technology support person was critical to the trial presentation and the viewing of the numerous exhibits introduced in this case"), *superseded on other grounds*, *Noranda Aluminum Hldg. Corp. v. XL Ins. Am., Inc.*, 269 A.3d 974 (Del. 2021); *Salt Meadows Homeowners Assoc., Inc. v. Zonko Builders, Inc.*, 2023 WL 1370997, at *7 (Del. Super. Ct. Jan. 31, 2023) (awarding $16,258.45 as "computer exhibit operator" fees because the "operator helped to keep the multitude of documents organized and readily available for witnesses").

[249] Centene Answer at 1.